Mr. Robbins for Appellant CTGR, Mr. Sharp for Appellants of Clark County, Washington, et al., Mrs. Schmexler for the Appellees, and Mr. Muskin for the Intervenor. Good morning and may it please the Court, I'm Larry Robbins for the Confederated Tribes of the Grand Ronde. To take land into trust for the Cowlitz under the Indian Reorganization Act, the Secretary must make two independent findings. First, that the Cowlitz were a recognized Indian tribe, and second, that the Cowlitz were under federal jurisdiction. The record of decision in this case misconstrued the IRA in both of those separate and independent respects. And subject to the Court's questions this morning, I'd like to devote my time to those two legal errors. First, the record of decision, or the ROD so to speak, erred when it held that the term recognized Indian tribe in Section 479 does not require recognition in 1934. I submit that the Supreme Court's decision, the U.S. Supreme Court's decision in John, which the ROD virtually ignored, is dispositive. In sustaining federal jurisdiction in a criminal case, the Supreme Court described the first definition in Section 479, which is the only one at issue in this case, as, quote, members of any recognized, and then they put in brackets, in 1934, tribe now under federal jurisdiction. I suggest... But where that in 1934 was in the statutory sentence, it didn't actually make a dispositive difference in that case, did it? In... In John's. Well, no, because ultimately the Court went off on the third definition in Section 479 to resolve John. But in route to that decision, they rejected the argument of the state of Mississippi. Well, they didn't reject it. What they said is even if the state of Mississippi is right that the first definition provides no authority for the 1944 proclamation at issue in that case, nevertheless, the third definition suffices. So at a minimum, Judge Pillard, I would argue that this is, if not something other than dicta, which it's been characterized as in this case, it's at a minimum considered dicta, given that it was litigated by the parties, given the fact that it was resolved by the Fifth Circuit. It is, therefore, at a minimum considered dicta, which in this circuit is authoritative. What about footnote 20 of the John case, even if we thought that this dictum was authoritative? Doesn't footnote 20, the language there, seem to anticipate that formal recognition of a tribe could come later when there they talk about that there's language in the footnote about until such time as the Choctaw Indians of Mississippi shall be organized as an Indian tribe pursuant to the act of June 18, 1934? I actually don't read the footnote to resolve the question. And I think what's more authoritative is Justice Blackmun's decision to put those brackets in there. But Judge Wilkins, if that were not enough, if that were not enough, there is also as additional authority that the brackets are meant to be taken seriously. There is the fact that, first of all, the Fifth Circuit in State Tax Commission came out that way. I would say that's the fair reading of Judge Wilkie's opinion for this court in Manor against Morton. It is also the fact, Judge Wilkins, that in 1980, the IVIA for the agency took the same position in the Brown case two years later. And then in 1994, 14 years thereafter, in a letter from the agency to Congress that is also in the record, the agency itself put 1934 in brackets in defining the year in which the recognition must be effective. So you have all of those materials, other cases, agency opinions. And then, too, there is the statute itself, which it's odd to come to last, but let me do that. We think the fair reading of the statute, the text by itself, for the reasons we say in our brief, tells us that the John case got it right when it said recognition must be as of 1934. Why didn't Justice Breyer seem to be convinced by the John case in his concurring opinion in what is a carcinery or a majority? I mean, they don't even cite the John case. They don't. And, you know, I suggest that it's always a tricky business to read anything into judicial silence, sounds of judicial silence. There could be any number of reasons why the carcinery court thought it more sensible or expedient to decide the case under the other prong of the first definition. But if you look at the text of the statute and if you look at the structure of the statute, everywhere you look, Judge Wilkins, there are signs pointing to 1934. The very next clause we know from carcinery points to 1934. But in terms of the overall logic of the statute, I mean, this is the Indian Reorganization Act, and there is, as you just pointed out, and we know from carcinery, now under federal jurisdiction is referring to now in 1934, under federal jurisdiction, but isn't the purpose of this law to allow, you know, a legal process to ensure that the Secretary properly recognizes tribes that it frankly hadn't really recognized up to that point? So the notion that we're going to freeze, that the Secretary is going to be cabined to 1934, not just in the sort of jurisdictional prong but on the recognition prong, it's hard for me to square that with what I understand to be the purpose of this law. Well, certainly Justice Breyer thought that the purpose of the law was to make essentially compensation for tribes that were already under the care and jurisdiction of the agency at the time, which is why he thought that now under the rest of the clause referred to in 1934. And I think, Judge Pillar, there's no, I don't disagree that there is, that we don't want to freeze agencies into time, but I think what Justice Breyer recognized is that you could, as an agency, realize years later that a particular tribe was in fact recognized and under federal jurisdiction in 1934, even though you didn't realize it. As a matter of fact, the very first case he cites in support of that proposition is the so-called Still a Guamish case. That was an instance in which there was in fact a treaty in effect in 1934, which the agency simply had overlooked in 1934, realized was in existence later, but it remained the case that even though they could come to their senses, as it were, or come to recognize in the colloquial sense years later, nevertheless, the tribe still was formally recognized by virtue of that treaty, and that's the way to read the law. But, Mr. Hutchins, it sounds a little bit like your reading collapses the two prongs, that recognition really becomes the factors and the circumstances that support jurisdiction are the same factors and circumstances that support recognition, because we're not talking about recognition in the later sense of recognized tribes. We're talking about recognition, I think we all understand, in 1934 in a more, as they say, anthropological sense. Yeah, I actually don't take that view. I think recognized meant political recognition in 1934 as well. As a matter of fact, the Rod cites a law review article, which in the very paragraph that they cite, actually makes my point, not their point, that from the IRA forward, it was a political recognition, just as this court defined political recognition in the California Valley case. I didn't really let you answer my question, which was how are you not collapsing the two prongs? Let me say exactly how they're different. I understand recognized to mean what this court understood it to mean in California Valley, a formal acknowledgement of a government-to-government relationship. But not all government-to-government relationships are such that one government is under the jurisdiction of another. And it's only by virtue of the kind of dealings that place one government, that is to say the Indian sovereign, under the jurisdiction or supervision of the government of the United States, does it also constitute a recognized Indian tribe now under federal jurisdiction. So in other words, under federal jurisdiction carves out from political recognition, from government-to-government relationships, a subset that were also under federal jurisdiction. Everywhere you look in this statute, to go back to my initial point about recognized, everywhere you look, the signs point to 1934. Let's look in the second definition. That's perfect. Is the second definition consistent with your first definition, or does your second definition, especially the way that the Supreme Court described it in John, make your construction of the first definition lack coherence? I think not, Judge Wilkins. I actually love the second definition from my argument. It tells you that the descendants must reside on a reservation in 1934. It tells us, again, as if it needed reinforcement, that 1934 is the focus. So too, by the way, is the – So a descendant resided in 1934, and if that descendant had a daughter, then they're not considered a descendant under your reading of the statute, because the daughter was born in 1940, let's say? Well, under the second definition, the descendants must live on a reservation in 1934. The daughter may be covered by another definition, the blood quantum definition. But she couldn't be covered by the second definition. I don't think – because I think the second definition is limited to descendants residing. She could be – well, there's the possibility, given some of the decisions of the agency, of constructive residing on a reservation. I'm not sure how much – I mean, I understand the point you're making about it pegging to 1934, but isn't it persons who are descendants of members who are residing? Well, I think the agency has interpreted the descendants as actually – the predicate is descendant. And for your purposes, I guess you're saying it doesn't really matter. The point is that it's pegging it to 1934. Correct. That's what's important. That's what's important. Can I just ask you about Chevron? Yes. You know, this is – this question about recognition, is it ambiguous? Is it – is the Secretary entitled to deference? Well, here I think Chevron does not come into play, not least because the Secretary did not regard that question as ambiguous. And this Court's precedents hold that when the agency believes that a particular interpretation is controlled by Congress and not ambiguous, Chevron does not come into play. As to the recognized problem, the Secretary took the view that the word now essentially bisects the statute, applies only to the under federal jurisdiction language, and therefore the statute was unambiguously in their favor. We think it's unambiguously in our favor because not only do we think – If we think it's ambiguous just for sake of argument, then does Chevron apply? No, then you must remand under this Court's precedent because the Secretary thought the question was controlled by the plain meaning of the text. The Secretary is wrong to think that it's controlled in her favor. We think it is clear and in our favor. And let me just say, because I fear I haven't gotten to my second argument and the Court has been very patient with me on time, but let me just say, in addition to all the authorities, the prior agency decisions, the other parts of the statute that point towards 1934, there's also 478, the immediately preceding portion of the statute, which called for IRA elections the very next year, in 1935. That tells you again that the tribes covered by this statute had to be recognized and under federal jurisdiction both in 1934. Now, if the Court agrees with that, that is enough to vacate and remand the case. But, as we say, as I said, there is a second and independent reason to vacate, and that is because the Cowlitz were not under federal jurisdiction in 1934. And let me make this point briefly, if I can. The R.O.D. most conspicuously fails to reckon in any serious way with the 2005 proceedings before the National Indian Gaming Commission. In this very case, with respect to this very parcel, in seeking a so-called restored lands exception to IGRA, the Cowlitz admitted and the NIGC determined that any recognition or jurisdiction for the Cowlitz was terminated as of 1934 and had been throughout the entire 20th century. That's what they went before the NIGC and said. That's what the agency held, and they did so on the face of abundant evidence, most of which has been conspicuously overlooked in the agency decision. What did your opponent say? The NGIC opinion has to do with recognition. I'm sorry. Yeah, recognition. It speaks more to recognition than to under federal jurisdiction. Well, no, actually, Judge Pillard. Well, what they say, I mean, it's a little hard to tell what the distinction of the NIGC opinion is. As far as I can tell, the rod basically says that was then and this is now. In fact, what the agency determined to support the restored land exception. And mind you, that was four years before Carcieri was decided. Nobody understood at that time what the legal implication of the finding they were about to make was. That's fine. I understand that. But what they said was throughout the 20th century, the Cowlitz were terminated. They were dispersed. They did not exist as a continuing as as a communal entity. And the agency cited evidence from 1924, 1933, 1968 and 75, stating, among other things, that the Cowlitz had been absorbed into their localities. And including a letter from Commissioner Collier, who was regarded as an authoritative source in Carcieri, that as of 1934, the Cowlitz quote is no longer in existence as a communal entity. I respectfully submit that's all you need to conclude that they were not under federal jurisdiction. As I take it, and I may be wrong and they'll get an opportunity to make their own case. But as I take it, their position would be no. It's sort of like your position with you can recognize without recognizing that you're recognizing that they say we didn't recognize them. But they were under federal jurisdiction in the sense that in the real world, we were interacting with them in some ways that bespeak federal jurisdiction. But when you read through the evidence that the Rod actually identifies negotiations, there's a failed treaty. They're negotiating. But, you know, the idea that that puts you... How can you negotiate with someone you don't recognize? Well, I would suggest that to have a negotiate... First of all, the negotiations, Judge Wilkins, were in 1855. So, you know, and what the NIGC determined was that whatever may have been the case in 1855, throughout the 20th century, this tribe did not exist. That is an awfully powerful finding that the Rod conspicuously fails to grapple with. And then I would submit to you that the evidence that, you know, I have to hand it to the Rod. They do identify various pieces of proof, all of which are terrible for the proposition that they're under federal jurisdiction. It's like... And then at the end of it, they say, well, there are all these little dealings with individual Indians and things like that. And maybe it adds up to under federal jurisdiction. But in the end, we think the evidence, you know, gathered by the NIGC and actually collected in the Rod shows you that they were not under federal jurisdiction. But above all else, the failure to reckon in any serious way with the contrary conclusion of the NIGC, I think, is decisive. I've used a lot of my time. I think we have to ask you to sit down. I do want to thank the court for its indulgence this morning. Thank you. Good morning, Your Honor. Benjamin Sharpen, behalf of Clark County Appellants. I do not intend to use any of Mr. Robbins' time. We support the arguments made by Grand Lawn, would make some supplemental points, particularly on the issue of under federal jurisdiction. In 1934, an Indian tribe was not under jurisdiction if it did not occupy land set aside by the United States under federal superintendence. There really is necessarily. Who said that? Pardon me? Who says that? Who says that? What's the authority for that? Well, I think, frankly, a hundred years of Supreme Court precedence in defining Indian country uniformly said it required both a set aside and federal superintendence. Most recently, in the 1998- You certainly are within jurisdiction if those conditions exist, but who says that unless, if you're not on a reservation, it cannot exist? What do you think is the strongest statement in support of that? I would say- If it is, then we wouldn't be indulging in all this back and forth. If the Supreme Court has said jurisdiction means you must be on a reservation at that time, that would be the end of the case, but I don't see that case. I wouldn't say it's a reservation. It's something defined as Indian country. It could be an Indian colony. It could be land set aside that wasn't a reservation, but the Supreme Court's decision in the village of Benite in 1998 said, our Indian country's precedence indicate that the federal government must take some action setting apart the land for the use of Indians, and it is the land in question, and not merely the Indian tribe inhabiting it, that must be under the superintendence of the federal government. But, Mr. Shepard, I think the question is why should we equate under federal jurisdiction with the legal definition of Indian country? Well- As I understand it, those are at least potentially two separate concepts. I think they are two separate concepts, but essentially the government entity can't exercise jurisdiction outside its territory, with very little exception, the jurisdiction of a country, a state, a county, an Indian tribe is limited at its borders. In instances here- I don't think that the jurisdiction of the federal government over Indians is considered to be exclusively territorial. You can have, it's more like you're a member of the bar, and we don't talk about that as jurisdiction, but it's geographically diffused, but you're still responsive to, and in some sense served by, that sovereign. So, no, I guess I'm pushing back on it, that there has to be territorial co-extensiveness for- There are a host of cases relative to the question of whether state jurisdiction is excluded from land set aside for Indians. I believe, or I would submit to you, when Secretary of Work in 1924 said of the palates that they were scattered throughout the southern part of the state, that they were absorbed in the body politic, he was saying, in effect, that they were not under federal jurisdiction, they were under state jurisdiction. And the federal jurisdiction is in contradistinction of the state jurisdiction, unless there is a specific agreement that allows both to be exercised in the same territory. And are you talking about for criminal law purposes, or for the cases that you're referring to? For virtually everything, there may be acts that extend, let's say, criminal jurisdiction to Indian country. In the absence of that, it is the sovereign tribe that controls that territory. These same concepts of the territorial element to jurisdiction, I think, were reflected in other comments by the agency, frankly, all comments by the agency prior to the Cartier decision. In this particular case, the historical technical report prepared by the Office of Federal Acknowledgement for the palates said the palates had dispersed among the white population and did not exist as an entity. Indians living off reservation were not seen as wards. The palates Indians were not considered legal wards of the government, since they did not have a reservation. That's at 626 of the Joint Appendix, a finding by the Secretary in connection with the acknowledgement proceedings, but seeming to me dispositive of the issue. More recently, in 2000, the technical report in support of the acknowledgement decision stated, from 1880 to 1940, the palates Indians were not a reservation tribe under federal jurisdiction. The question I think we need to address is how can the tribe not be under federal jurisdiction in 2001, and in 2013, the Secretary can determine that they were under federal jurisdiction. They're directly contradictory statements. I'd like to quickly address the issue of initial reservation. The Indian Gaming Regulatory Act prohibits gaming in newly acquired land after 1988. There are two exceptions. Both exceptions for initial reservation for stored lands rely specifically under a definition of historic, significant historical connection. In this case, the standard in 25 CFR 292.6 says that the land must be within an area where the tribe has significant historical connections. The record of decision translated that to say significant historical connections to land in the vicinity of the palates parcel. Now, there are a series of prior decisions by the agency defining a historical connection. These are all cited in our briefs and are contained in the record. They define significant historical connection as akin to aboriginal use and occupancy, or more recently in the Mashpee case, is enduring, substantial, and non-speculative. Other cases have found subsistence use or occupancy requires something more than a transient or occasional presence in the area. Mr. Sherb, would you make a distinction between the restored land standard and the initial reservation standard for purposes of geographic relationship to the land? Yes and no. Obviously, there are different standards. Obviously, the Secretary chose different definitions to meet that standard. Both employ the same definition in 290.2.2 of an historical connection. Of what? What did you say? They both share a common definition of an historical connection to the land. In both cases, the cases I'm citing, some of which are restored land opinions, are still construing the term an historical connection. The type of connection is really parallel in the two areas. In those cases, they even wrestle with the issue of what does in the vicinity mean, as was relied upon here. In the Scotts Valley case, they articulated the test as a determination of whether a particular site with direct evidence of historical use or occupancy is within the vicinity of a newly acquired land. It depends on the nature of the restored connection. All right. I think Mr. Sherb, your time has expired, and we'll hear from the department. Thank you, Your Honor. I reserve one minute to talk. May it please the Court. Good morning, Your Honors. John Smeltzer for the Department of the Interior. Your Honors, I'd like to start with the issues of the Secretary's Trust Authority under the Indian Reorganization Act. Before I get into the specific text of the statute, what I'd like to do is give this Court three factors that I think are critical for determining and analyzing the application of the statute in this case. First of all is a simple point, but it's the point that the Cowlitz Tribe existed in 1934. The plaintiffs in this case have briefed and argued it as though the Cowlitz did not come into existence until the year 2000 acknowledgment decision. But that's a complete misunderstanding of the acknowledgment decision. What that decision says is that the Cowlitz Tribe was unambiguously acknowledged and recognized back in 1855 and through the 1800s, and that the Cowlitz Tribe continued to exist as a communal and political entity through 1934 and through to the present time. That acknowledgment decision was not challenged, and the findings are the record in this case. So what that means is, again, the Cowlitz Tribe existed, and they were entitled to official recognition in 1934, the date that the plaintiffs allege is the critical date. The second critical factor is that the United States specifically exercised jurisdiction with respect to the Cowlitz Tribe. We are not saying in this case, Your Honors, that the Cowlitz Tribe was under federal jurisdiction for purposes of the Indian Reorganization Act simply because they existed and deserved federal recognition in 1934, but because the United States conducted a series of actions that specifically, and so doing, incurred specific obligations with respect to the Cowlitz Tribe. And to put the full context on it, the place you need to start is in 1850, where Congress passed an act and said to federal officials, you are to go out and negotiate treaties with tribes west of the Cascade Mountains to settle their land claims so we can make these areas open for settlement. And again, this is the time of the Oregon land rush, and they're anticipating there's going to be conflicts between settlement and tribes. And so Congress is specifically saying, go and identify tribes that have legitimate land claims and negotiate treaties with them. There is no question that the Cowlitz Tribe had a legitimate land claim. As part of the record, the Indian Claims Commission determined they had a 2,500 square mile area of land where they had aboriginal exclusive use. That was their land. They were identified in 1855. They were negotiated with. There's no question that they had a legitimate land claim. Unfortunately, a treaty was not completed, but of course, the government did go ahead and open up the lands for public sale and thereby unlawfully took their lands and left the Cowlitz Tribe homeless. And that is the set of factors that set into place everything that follows. All of the following actions by the federal government to assist the Cowlitz Tribe with respect to trying to find homes for individual Indians and for the tribe with Indian schools and all of the work that follows comes from the fact that the United States initiated this jurisdictional action, rendered the tribe homeless, and then had duties and obligations with respect to the tribe. That's different than just saying, as in the Karcheri case, that the tribe was within the borders of the United States. The third critical factor is, Your Honor, the point that nothing that the plaintiffs and the appellants point to with respect to this notion of administrative termination would be sufficient to terminate the duties and obligations that began through this historical set of circumstances that I just described. What they're talking about with respect to administrative termination is simply the neglect or failure of federal officials to recognize, as Judge Pillard, you had discussed, the distinction between recognition and jurisdiction. Now, if Congress comes in and passes a statute and says, we're going to divide up a tribe's lands and provide them to the tribe and the tribe will no longer have sovereignty, Congress can do that. The Department of the Interior cannot. And simply failing to recognize a tribe at a particular point doesn't, it goes to recognition, certainly, but it doesn't go to jurisdiction and whether jurisdiction continues through 1934. Can you tell us a little bit more, Mr. Smelter, about the Department of the Interior's position, history of the position on recognition not being temporally rooted or restricted to 1934? Is there any kind of memorialization of that or policy statement? Or what's the sort of strongest place to go where the Department has said, recognition under the Act in contradistinction to how Mr. Robbins would have us do it? The strongest place is in the decision itself and in the M opinion, which is a reiteration of the decision that came out after the Callas decision. But there were roots of the same interpretation in the Stillaguamish memo that came out in 1980 that is cited in the Carchiri case by Justice Breyer. And so there are and there were interpretations to that effect prior. I guess with respect to that determination, what we would say is where you have the language of the statute such that the term recognized appears before the term now under federal jurisdiction and it can be read as Justice Breyer suggested in his concurring opinion in Carchiri and then two other judges in their dissenting opinions, Justice Souter and Justice Ginsburg, also recognized that that was a fair interpretation of that. There is no authority, I should say, on the other side that there's some rule of grammar or some rule of logic that says But isn't there authority on the other side that recognized Indian tribe as a term of art? Well, it's a term of art that initiated with the Indian Reorganization Act, Your Honor. That phrase didn't appear in federal statutes prior to that time. And the question is what is a reasonable interpretation of that phrase in the context of the act? And what we suggested is that the term recognized goes to whether you have a tribe in existence in 1934 that merits official recognition. And there's no reason that through the legislative history of the purpose of the statute that you would presume that Congress did not want to provide or to allow the Secretary of the Interior to provide for tribes to whom we owed actual obligations, to whom we had actually exercised jurisdiction simply because officials at the time did not, and historically we now know wrongfully, did not recognize the continued communal and political existence of the tribe. How does that first definition, if we accept your view of it, how is that consistent with the second definition? And the Supreme Court construed the second definition in the U.S. v. John case to mean that the descendant had to have been living on a reservation as of June 1st, 1934. And if the descendant was, then how do we identify that descendant if we don't know whether that descendant was part of a recognized tribe as of that time? Let me answer it two ways. I think John referred to the third definition, which is the whole concept. John was based on the third definition, but there's language in John discussing the second definition at page 650 of the U.S. reporter pagination where they say that the second definition refers to descendants who were then residing on any Indian reservation. That's how the Supreme Court then, because they're ruling out or they're observing how the first and second definitions work or not as far as applying to this case. And then they decide, you know, based on the third definition. Judge Wilkins, as we said in our brief, that there's no disconnect between the first and second definition if you understand that, you know, the acknowledgment of the Kalats tribe after the fact means that they were a tribe under federal jurisdiction in 1934, and they could have had descendants living on a reservation in 1934. I mean, there's only a conflict if you assume that the second definition is somehow intended to apply only after a tribe is acknowledged. And again, what we say, what the term recognized goes to is the duty that federal officials have to go through at the point that they apply the statute, right? They have to ensure that there is a tribe that meets the objective standards that fall within the language under federal jurisdiction or one of the other definitions of Indian tribe. And is it your position that the Secretary has consistently taken this temporarily not limited view of recognition? Because as I read the record, there are several places where the Secretary appears to say recognition means recognition as of 1934. I don't think the Secretary has ever drawn that distinction. There are some instances that are cited, the Brown IBIA decision in a 1994 memo where the 1934 was put in brackets before the now. But in that memo, this issue did not come up. And of course, that memo was prior to Karcheri. And so the issue of whether recognized has to be official recognition in 1934 versus whether under federal jurisdiction it has to be 1934 was not an issue in that memo. It was not an issue in the Brown decision. It was not an issue in John. None of the – all of the things they point to historically is suggesting that there was a different interpretation. None of those cases actually specifically grappled with this issue. Look, now that the Supreme Court has determined, right, that now means in 1934, and remember Department of Interior was before the Supreme Court suggesting the other view, right? But once the Supreme Court determines that now for purposes of under federal jurisdiction means in 1934, then the issue comes up, well, does that also apply to recognize? Of course, they didn't address it. The majority in the Supreme Court didn't. And all the judges who did address it, right, said as a matter of fact, you know, or stated sort of matter of factly that clearly you could interpret it reasonably the other way. And what about Chevron and what about Mr. Robbins' position that you've taken the position that it's clear your way, that it's not temporarily limited to 1934, and therefore whatever we think you're not entitled to Chevron deference because you haven't exercised the interpretive authority to which a court could defer under Chevron? Well, clearly the department exercises interpretive authority. Maybe they didn't specifically say that that part of it, that aspect of it was ambiguous. But I think what Mr. Robbins said is not that you could then decide it, but that it would have to go back to the agency. Do you agree with that, that it would have to go back? You know, there's a rule of prejudicial error, and it makes no sense to send it back. We know what the agency, how it's interpreted. We know it's reasonable. There's no reason for that to go back. So, no, that doesn't make sense. And tell us why it's clear. I mean, it's a curious case where you have two parties taking contradictory positions on statutory language and both saying it's completely clear. What's your best support for why you think it's clear in your direction? Why now? Recognition. Is recognition now or ever as opposed to in 1934? Well, again, I think what we said in the brief, it's reasonably construed that way. You know, we don't have to say that it could only be construed that way. And you're not saying that. I'm certainly saying that it makes more sense to construe it that way. And the best point I can make in that regard is, Your Honor, there's no marker of what it would have meant in 1934 on that particular date to determine, right? There's no, as we say in our brief, there's no official list of tribes that have been recognized and that continue to be recognized now as of the particular date of the enactment. The only way you're going to know, right, is by asking Interior. And once you ask Interior, they have to make a decision, you know, after the statute is applied. It almost could only happen after the fact with respect to that term. There were some AGRA issues raised, if I may just briefly address the Gaming Regulatory Act. And a key point to make there is simply this isn't a statutory standard. It's a regulatory standard that the Secretary is interpreting her own regulations which were imposed for policy reasons, the notion that there needs to be a historical connection. And what we're talking about is interpreting the standard in 292.6, which says that what has to be found is that the land that's acquired is in an area where there are significant historical connections. And so we're talking about terms like area, and vicinity comes up because it's in the further definition of historical connection. But we're talking about broad terms like vicinity and area, significance, which are all terms we submit that the Secretary has owed considerable deference to. What about Mr. Sharfstein? That has to be Indian lands. The preamble to that, I think what he was saying is it has to be within their aboriginal area. And when the Secretary promulgated the regulations initially and spoke of the initial reservation exception, the preamble specifically states that it's not limited to areas that are in their aboriginal exclusive use area. We're not going to do that because those lands may not be available. So whatever importance is put in the words, significant historical connections, it is not that. It does not mean aboriginal lands, and the prior decisions of the Secretary say that. If there are no further questions. Thank you, Your Honor. Thank you. Mr. Luskin, we've given you a princely three minutes. Thank you, Your Honor. Your Honor, may it please the Court. I can't rise for the Cowlitz tribe without calling attention to the fact that the Secretary's action, which this Court is reviewing, will reverse more than a century and a half of shameful abuse of this tribe by the federal government. I'm not so young or so naive to believe that that in itself is a consideration. But we also have to bear in mind that the Court is being asked to interpret two statutes, the IRA and IGRA, which are themselves remedial. And I want to turn to the question of what recognition under federal jurisdiction means and try, perhaps vainly, to simplify the discussion. The IRA, its overarching purpose was to reverse a longstanding policy of forced assimilation and fragmentation of tribes by encouraging tribal self-government, by providing the means to create sustaining communities and, among other things, to permit the Secretary to take land into trust and create reservations for Indians who had been so cruelly abused that they weren't even living on reservations in 1934. We also know that the words now under federal jurisdiction were added as words of limitation to that definition. But it seems clear from the contemporary legislative history and commentary that no one knew exactly what they meant. But limiting the authority of Interior to recognition in 1934 not only makes no sense as a textual matter, particularly considering the fact that the phrase now under federal jurisdiction was added to a bill in which the words recognition already existed, it also makes no sense as a legal matter. There was no such thing as federal recognition in 1934 as a formal legal matter and would not be for more than four decades to follow. There was no list of federally recognized tribes in 1934 and there would not be for another six decades. And so to suggest in hindsight that what the Cowlitz needs to prove is something that did not then exist simply turns the statute upside down. We also know that it could not have meant simply tribes living on reservations. Now clearly a tribe that is on a reservation could probably establish more easily as a factual matter that it was recognized under federal jurisdiction. But since the statute itself was designed to give the Secretary authority to create reservations for previously landless tribes, to make that a condition of recognition in federal jurisdiction defeats the purpose of the statute. Now as to the question of whether the Cowlitz were recognized, they went through the acknowledgement process in 2000 and as part of that acknowledgement process, as Mr. Smeltzer indicated, and that is a process which is not under review by this court, the interior found unequivocally that that is both a political matter and an ethnographic matter, that the Cowlitz tribe existed as a separate social band with a functioning political organization from time immemorial up through 2002 when that acknowledgement process was complete. But by any rational definition of recognition, they were recognized in 1934 and the acknowledgement process so found. As to federal jurisdiction... They were recognized or within the jurisdiction? They were not recognized in a legal sense because no such process existed, Your Honor. You're saying they were under the jurisdiction in 1934. Absolutely, but what I'm also saying is that by any definition that the court would apply to the term recognized, the later finding by the Interior Department that they existed without interruption as a social and political organization would satisfy any reasonable definition of recognized. As to under federal jurisdiction, Your Honor, all three branches of the government took action contemporaneously with the passage of the IRA in 1934 that affirmed federal jurisdiction. And in no particular order, let me start with the courts. In Halbert in 1931, the Supreme Court construed a statute that Congress passed in 1911 which said that members of certain unspecified tribes were entitled by virtue of their tribal membership, not because they were Indians by blood, to allotments in the Connaught Reservation. And the court found that the Cowlitz tribe, although not specified in that 1911 statute, existed and that their members were entitled to assert the benefits of that statute. That's 1931. In 1928, Congress passed the statute that authorized jurisdiction in the Court of Claims for the Cowlitz to assert a claim for the land that had been taken from them in 1863. Again, that legislation by Congress, which was vetoed by President Coolidge, is an unequivocal assertion by Congress that there was a continuing relationship with the Cowlitz tribe that certainly by any meaningful definition would qualify as under federal jurisdiction. There is also, and I refer the court to the Record of Decision, pages 97 to 104, voluminous evidence that the Secretary relied on to reflect jurisdiction, not the least of which first is the fact that 13 times during the period 1926 to 1934, the Secretary, through the Commissioner of Indian Affairs, asserted its authority to oversee the hiring of attorneys by the Cowlitz tribe, in part to assert these land claims. Mr. Luskin, your time has expired. Thank you, Your Honor. Thank you. I appreciate it. You have no remaining rebuttal time, but we'll give you two minutes. Thank you very much, Your Honor. Very quickly, the argument my friend Mr. Luskin just made to the effect that, in fact, the Cowlitz were politically recognized in 1934 is not a ground on which the rod can be affirmed because it's not the ground on which it was decided. The rod was decided on the premise that recognition could be as recently as last week, not in 1934. That is, to go back to the question Judge Pillard asked earlier of the government, that is manifestly inconsistent with what the agency has repeatedly said. In the Brown decision, 1980, in the 1994 letter, in the record at Joint Appendix 4636, the agency has said in both instances that recognition must be as of 1934. And in the Brown decision, that was with respect to the Cowlitz itself. That's why the devise to the Cowlitz tribal member didn't succeed on the basis of the first definition. Judge Wilkins asked the question about how the second definition could make sense if recognized can float in time and be 70 years after 1934. I would suggest that it cannot make any sense. It renders the second definition incoherent. If you are a descendant of a recognized, of a member of a recognized tribe, how can you know if you're such a descendant if the recognition won't take place for 70 more years? The suggestion that the federal acknowledgment constitutes a recognition is exactly the opposite of what the agency said when they publicly announced the federal acknowledgment at Joint Appendix 1077, where they expressly distinguished between what it means to acknowledge a tribe and what it means to recognize a tribe, which they defined in the federal register as referring to an actual government-to-government relationship as distinguished from the identification, as it were, that is sufficient for federal acknowledgment. And finally, let me just say this. If, notwithstanding the debate you've heard this morning and in the papers, the Court concludes that the temporal component of recognized is in fact ambiguous, which neither side seems to think it is. But if you conclude, nevertheless, that it is, this Court's decision in Peter Pan Bus Lines 471 F. 3rd, 1350 at 1354 is one example of many in which the Court, as a result of concluding that it's ambiguous and not unambiguous as the agency thought, remands as a result. We don't think you need to because we would hold the agency to its historical position that recognized means recognized in 1934. Thank you, Your Honors. Thank you. Do we ordinarily give both parties on the bottom side of rebuttal time, Mr. Sharpe, or if you want to have one minute, you may. Thank you, Your Honor. I just wanted to clarify. Once you, Judge Bullard, mentioned that the IRA was passed in part to create recognition, it does not authorize the Secretary of Recognition. In fact, there's no statute that does so, and the first time administrative recognition occurred was in 1978. The concept of recognized tribe, Judge Wilkins, was in existence long before the IRA. The tribe was recognized through a treaty. In 1871, Congress passed an act, which is cited on page 16 of our brief, no Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty. That act withdrew that authority from the executive branch and reserved it to the legislative branch. The one point I would make, when under federal jurisdiction, is it seems to me the very picture of arbitrary and capricious for the Secretary to say this tribe was under jurisdiction in 1934. In 2013, in 2001, to say, at page 1076 of the record, from 1880 to 1940, the Cowlitz Indians were not a reservation tribe under federal jurisdiction. Thank you. Thank you. All right.
judges: Pillard, Wilkins, Edwards